## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATIONWIDE MUTUAL** | : | **No. 3:10cv374** |
| **INSURANCE COMPANY,** | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TIMOTHY SHAW;** | : | |
| **TIMOTHY SHAW, d/b/a SHAW** | : | |
| **BROTHERS DONKEY** | : | |
| **BALL CO.; and** | : | |
| **ROBERT EISENBERRY,** | : | |
| **Defendants** | : | |
| | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Before the court are the parties' motions for summary judgment in this declaratory judgment action. Having been briefed, the matters are ripe for disposition.

**Background**

This case arises from a dispute over insurance coverage between Plaintiff Nationwide Mutual Insurance Company ("Nationwide") and Defendants Timothy Shaw, the Shaw Brothers Donkey Ball Company and Robert Eisenberry. On September 4, 2007, Defendant Robert Eisenberry suffered a paralyzing injury while stacking and moving bales of hay at a barn leased by Defendant Thomas Shaw for use in his family's entertainment business, the Shaw Brothers Donkey Ball Co. Eisenberry allegedly fell from a second-floor loft while assisting Shaw and another

person move hay bales.

Shaw sought coverage for any liability to Eisenberry under the policy of insurance issued him by Nationwide.  On June 19, 2008, Nationwide denied the claim, citing a number of grounds.  On August 28, 2009, however, Nationwide agreed to participate in Shaw's defense pursuant to a reservation of rights.  Among the reserved rights was a right to disclaim coverage pursuant to the policy's employer's liability exclusion.

On February 19, 2010 plaintiff filed an action in this court seeking a declaratory judgment that Nationwide was not obligated to cover defendants under the policy of insurance in question.  After discovery, the parties filed the instant motions for summary judgment, bringing the case to its present posture.

**Jurisdiction**

Plaintiff is Ohio corporation with its principal place of business in that State. Defendants are Pennsylvania citizens.  The amount in controversy exceeds $75,000.  The court has jurisdiction pursuant to 28 U.S.C. § 1332.   Because the court is sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Defendant moves for summary judgment on plaintiff's claims.  Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

2

there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir.

1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence

of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986) (emphasis in original).

    In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion.  International Raw

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party.  Anderson, 477

U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit

under the governing law.  Id.  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v.

Catrett, 477 U.S. 317, 322 (1986).

**Discussion**

    The court's task here is to interpret the language of an insurance contract.  In

interpreting an insurance contract the court will give effect to the language of

contract when that language is clear and unambiguous.  Standard Venetian Blind

3

Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983).  If the language is ambiguous, "the policy provision is to be construed in favor of the insured and against the insurer."  Id.  Ambiguity exists for a contractual term "'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'"  Madison Construction Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (quoting Hutchinson v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986)).

Each party raises various grounds for granting their summary judgment motion.  The court will address them in turn, as appropriate.

## A.  Nationwide's Motion

### i.  Shaw's Insurable Interest in the Barn

Nationwide argues that Defendant Shaw lacked any insurable interest in the barn where Eisenberry's injury occurred and the court should therefore grant plaintiff summary judgment and find that the policy does not provide coverage to defendants. The limited liability company ("LLC"), not Shaw, leased the barn in question at the time of Eisenberry's injury.  The LLC likewise owned and operated the exhibition business housed in the barn.  Defendants point to correspondence from Nationwide that indicates Shaw and the Shaw Brothers Donkey Ball Company were insured with respect to the conduct of the business.  Feeding and housing the donkeys–the activity engaged in by Eisenberry when injured–is conduct of the business and insured under the policy.

4

At his deposition, Defendant Shaw testified that at the time of Eisenberry's fall he owned a company "with the trade name Shaw Brothers Donkey Ball Company." (Shaw Deposition (hereinafter "Shaw Dep.") Exh. A. to Defendant's brief in support (Doc. 25) at 7). He clarified that the correct trade name was "Shaw Brothers Donkey Ball, LLC." (Id.). Shaw operated the business himself, but he had begun using the LLC name in approximately 2003. (Id. at 8). Shaw also testified that at the time of the incident the "LLC" leased the barn where the accident took place. (Id. at 14). The LLC "ran a business called Donkey Basketball where we supplied schools and communities donkeys to play basketball to raise funds. And we housed the donkeys at the barn." (Id. at 16). Shaw also testified that the insurance policy named him as the insured, doing business as the Shaw Brothers Donkey Ball Company, a "sole proprietorship," not an LLC. (Id. at 58). Shaw testified, however, that he understood the Nationwide policy in question to cover the "business" represented by the LLC. (Id. at 11). He purchased this insurance through Tom Weaver, an agent for Nationwide. (Id. at 12). Weaver had been Shaw's agent since at least 1970. (Id.). According to Shaw, "[w]e always had the liability through Nationwide . . . as far back as . . . the 70s." (Id. at 13). He also admitted that he leased the barn through the LLC and not under his own name. (Id. at 14).

An investigator named Dave LaRose interviewed Shaw on February 6, 2008. (Transcript of Interview, dated 2/15/2008, Exh. E to defendants' motion for summary judgment (Doc. 25) (hereinafter "LaRose Interview")). In that interview, Shaw explained that he began operating the business his father and uncle had established

5

in 1988.  (Id. at 2).  At first, he operated that business as a sole proprietorship.[1]

Shaw formed the LLC in 2003 or 2004.  (Id.).  He could not explain his reasons for

forming the limited liability corporation, though he did so on the advice of his

attorney.  (Id. at 3).  Shaw later informed the investigator that he had a "general

liability policy" with Nationwide, covering "Donkey Basketball."  (Id. at 6).

The court will deny the motion for summary judgment on these grounds.

Plaintiff argues that the insurance policy did not cover Shaw for the accident that

occurred at the barn.  The barn, plaintiff insists, was not leased by Shaw or the sole

proprietorship, the parties covered by the policy of insurance.  The insurance policy

in question was issued to Timothy E. Shaw, DBA Shaw Bros. Donkey Ball Co., and

business listed as a "sole proprietorship."  (Policy of Insurance, Exh. 1 to Plaintiff's

Motion (Doc. 27) (hereinafter "Insurance Policy")).  The evidence indicates, however,

that the parties involved, particularly Shaw and his insurance agent, did not draw a

distinction between the LLC and the entity it replaced, the Donkey Ball Co.  No

evidence indicates that Shaw ever took out a separate insurance policy to cover the

LLC, but instead demonstrates that he considered the policy he signed (a general

commercial liability policy) to cover the operations of the Donkey Ball business he

ran.  Indeed, Shaw testified that he paid his agent for this insurance policy with

checks from the LLC.  (Shaw Dep. at 17).  Since the policy was a commercial liability

policy, Shaw had no reason to continue to renew an insurance policy for an entity

---

[1]DeRose and Shaw referred to the arrangement as a "DBA."

that no longer existed.

Defendant Shaw argues that the court is required to ascertain the insured's intent in determining whether coverage exists under the policy.  The court agrees, since in Pennsylvania "'courts must examine the totality of the insurance transaction involved to ascertain the reasonable expectation of the insured.'" Bowersox Truck Sales & Serv. v. Harco Nat'l Ins. Co., 209 F.3d 273, 279 (3d Cir. ) (quoting Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994)). The Court concludes that the defendant had a reasonable expectation that the insurance he purchased included coverage for the LLC.  The defendant clearly changed the name of the business and informed his insurance agent of that name change.  He continued to operate that business, and never intended to create two separate entities.  Instead, he purchased insurance, which he assumed covered the business he operated, the LLC.  The court finds that Shaw never intended to purchase insurance for a company that no longer existed, but clearly intended to purchase insurance for the company he operated under a new name.   The court will deny the plaintiff's motion on these grounds.  The court finds that the policy covered both Shaw and the LLC.

### ii.  Indemnity Obligation for Premises Liability

Nationwide next argues that the company has no indemnity obligation to defendants for premises liability because Shaw was not engaged in the covered business of training donkeys for fundraising events at the time of the accident in question, and the barn where the injury occurred was not property owned, rented or

occupied by the exhibition business.  The policy covers the business, not the premises, and does not provide any coverage to Shaw under the circumstances.  As a result, defendant insists, the court should grant judgment to Nationwide and declare that no coverage exists under the policy.  Defendants argue that an endorsement to the policy covers activities in property rented by the business and the policy therefore covers the premises where the injury occurred.

An endorsement to the policy contains a provision that provides that the insured is covered for "liability arising out of your operation of premises owned by or rented to you."  (Insurance Policy).  For the reasons explained above, evidence indicates that the LLC and the Donkey Ball Company were the same entity, and covered by the general commercial liability policy issued to Shaw and the Donkey Ball Company.  As a result, the barn leased by the LLC would be covered by the policy here in question.  The court will deny the motion on the grounds that the insurance policy did not cover the premises where the accident occurred.

The court also declines to grant summary judgment to the plaintiff on the grounds that feeding and caring for donkeys, the activity in which Eisenberry was engaged when injured, was not covered by the policy.  The insurance policy covers injuries "caused by an offense arising out of your business only if the offense was committed in the 'coverage territory' during the policy period."  (Policy of Insurance).  The dispute here is over whether the incident involving Eisenberry was "an offense arising out of [defendant's] business."  (Id.).  The policy does not provide a definition of such an offense.  As explained above, ambiguity exists for a contractual term "'if it

8

is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Madison Construction Co., 735 A.2d at 106. The court finds "an offense arising out of" a "business" to be ambiguous, as there is not one meaning available for "arising out of." In this context, the term could mean as a result of actual exhibitions of donkey basketball and be confined to incidents that occur in that setting. The term could also mean, however, anything related to the operation of the business, including office work and maintenance. Since that term is ambiguous, "the policy provision is to be construed in favor of the insured and against the insurer." Standard Venetian Blind Co., 469 A.2d at 566. Construing the provision in favor of the insured, the court finds that caring for and feeding donkeys is action arising out of the business of Donkey Ball exhibitions. The parties do not dispute that donkeys are a central component of the operation and staging exhibitions would be impossible if the animals were not in good health. As such, an injury sustained while caring for the animals would be an injury covered by the policy. The court will deny the plaintiff's motion on these grounds. The policy of insurance does not exclude injuries sustained while arranging to feed the donkeys.

### iii. Employee liability exclusion

Finally, plaintiff argues that the court should grant Nationwide summary judgment on the basis of an "employer's liability" policy exclusion and declare that no coverage exists under the policy. Nationwide contends that Eisenberry was serving as Shaw's employee at the time of his injury, and thus coverage is unavailable for defendants. Nationwide argues that Pennsylvania law demonstrates that Eisenberry

9

was Shaw's employee, citing to workers' compensation law and common law in the state.  Plaintiff also argues that Eisenberry could not be considered Shaw's temporary employee.  Defendants contend that Eisenberry was not an employee under the policy's terms.  As such, the court should grant the defendants' motion for summary judgment and declare that the policy provides coverage for the incident in question.

The policy in question contains a number of exclusions.  (Insurance Policy).  Among those exclusions is an "Employer's Liability" exclusion.  (Id.).  The insurer is not obligated to cover "'bodily injury' to (1) An 'employee' of the insured arising out of and in the course of: (a) Employment by the insured' or (b) performing duties related to the conduct of the insured's business."  (Id.).  The policy does not define the term "employee" directly, but instead relies on comparing and distinguishing an "employee" from other workers defined in the policy.  An "'employee' includes a 'leased worker' but does not include a 'temporary worker.'" (Id.).  A "leased worker" is "a person leased to [the insured] by a labor leasing firm under an agreement between [the insured] and the labor leasing firm, to perform duties related to the conduct of your business."  (Id.).  A "leased worker" is not a "temporary worker." (Id.).  A "temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workloads." (Id.).  A "volunteer worker" is a non-"employee . . . who donates his or her work and acts at the direction" of the insurer "and within the scope of duties determined by" the insured but who "is not paid a fee, salary or other compensation" by the insured "or

anyone else for their work performed for" the insured.  (Id.).

The question here is whether Eisenberry was Shaw's employee at the time of his accident.  Shaw testified that Eisenberry cleaned stalls, fed and watered donkeys, moved hay and straw for the company.  (Shaw Dep. at 35-36).  Shaw knew Eisenberry for ten to twelve years before the accident.  (Id. at 37).  He had met Eisenberry through Mr. Parks, a farmer who lived nearby and baled hay for Shaw. (Id. at 36).  Eisenberry "hung out" at Parks's farm.  (Id.).  Eisenberry was not a close friend of Shaw's when the accident occurred.  (Id.).  Shaw testified that Parks told him that Eisenberry, "an old farmer," would be available "if you ever get stuck or whatever," and this recommendation was "how [Eisenberry] came about to come help us."  (Id.).

Testimony indicates Eisenberry helped Shaw feed and water his donkeys "10 to 12 times" during the year when the accident occurred.  (Id. at 38).  Eisenberry also cleaned stalls a few times during that year.  (Id. at 38-39).[2]  Eisenberry had "four or five horses . . . some pigs.  Some dogs.  Some cows."  (Id. at 39).  When Eisenberry "assisted" at Shaw's barn, Shaw would give Eisenberry hay.  (Id. at 40).  This hay came from hay stored in the barn.  (Id. at 41).  Shaw did not know how much hay Eisenberry took, though he was aware that Eisenberry sometimes transported the

---

[2]The testimony is somewhat confused.  Shaw related that Eisenberry fed and watered the donkeys 10 to 12 times during the year.  (Shaw Dep. at 38).  He also agreed that Eisenberry could have cleaned stalls "a few Sundays, a couple of Sundays a year." (Id.).  When Eisenberry cleaned the stalls he also fed the animals.  (Id. at 39).  In the end, however, Shaw agreed that Eisenberry "wouldn't have come separately to water or fed [sic] if he wasn't cleaning the stalls[.]"  (Id.).  The testimony could therefore be read to say that Eisenberry either fed and watered the donkeys 10-12 times a year or "a few."

hay with his truck, and sometimes borrowed Shaw's truck.  (Id.).  Eisenberry always

had permission to use Shaw's truck, since Shaw was "the type of person" who "if

somebody is down on their luck" he cared for them.  (Id. at 42).  Eisenberry used the

truck both when he cleaned the stalls and for his personal needs.  (Id.).  Eisenberry

had used the truck on the day of his injury.  (Id. at 42-43).  Shaw described

Eisenberry's motivation for showing up at the farm as "he had a good heart.  And,

you know, he was willing to help out because . . . he was semi-retired if not retired."

(Id. at 62).  Coming to the farm "gave him something to, you know, come up."  (Id.).

Eisenberry would watch Shaw perform tasks like trimming donkey's feet "for hours,"

perhaps for "companionship" or "to fit in."  (Id.).  In the end, however, Shaw testified

that Eisenberry cleaned stalls ten to twelve times per year, which was fairly

demanding labor, and received "some hay, use of my truck.  And sometimes . . .

he'd borrow money or [Shaw would] give him money."  (Id. at 66).  Shaw described

this relationship to an investigator: Eisenberry would throw hay or shovel manure for

an hour or two, receiving either hay or a small amount of gas or gas money in return.

(Exh. E at 8).

Eisenberry provided testimony in several matters related to this case.  Plaintiff

deposed him in this case.  (See Exh. 4 to Plaintiff's Motion for Summary Judgment

(Doc. 27) (hereinafter "Eisenberry Dep.")).  Eisenberry testified that he would "take"

"five or six" bales of hay per month from Shaw.  (Id. at 35).  In a deposition given in a

case Eisenberry filed against Shaw, Eisenberry testified that he had "worked for Tim

Shaw" a few days per week.  (Eisenberry Deposition, Exh. 5 to Motion for Summary

Judgment (Doc. 27) at 12).  At the same time, however, Eisenberry denied that he was "actually employed by" defendant.  (Id.).  Shaw "didn't want to put me down as an employee."  (Id.).  Eisenberry had met Shaw twelve years previously.  (Id.).  He had worked for a friend of Shaw's, and "Tim came up and asked me if I wanted a job, I said yeah."  (Id. at 13).  Eisenberry spent "two days a week doing the barn . . . and the rest of the time he'd call me up if he needed me for anything."  (Id.).  Shaw sometimes paid Eisenberry in cash, "sometimes not."  (Id.).  On the day of his injury, Shaw had called him and "told [him] to be at the barn."  (Id. at 31).  At trial in a case involving his injury, Eisenberry testified that he would "help" Shaw by cleaning "barns, feeding animals whenever he needed them fed, and help with just about most anything you could do up there."  (Eisenberry Testimony, Exh. 6 to Plaintiff's Motion for Summary Judgment (Doc. 27) at 58).  He provided this "help" "every Sunday."  (Id.).  On the day of his injury, Shaw had asked Eisenberry "to, essentially, work in the straw department."  (Id. at 77).

Eisenberry also submitted an affidavit in connection with this case.  (See Exh. F).[3]  At the time of the accident, Eisenberry was self-employed as a trash collector.

---

[3]Nationwide urges the court not to consider this affidavit as evidence, arguing that the affidavit contradicts Eisenberry's earlier deposition testimony.  Courts have found that "'a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" Jimenez v. All Am. Rathskeller, Inc., 503 F.3d 247, 251 (3d Cir. 2007) (quoting Baer v. Chase, 329 F.3d 609, 624 (3d Cir. 2004)).  "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Id. at 253.  Still, "not all contradictory affidavits are necessarily shams." Id. at 254.  "[M]erely because there is a discrepancy between deposition testimony and the deponent's later affidavit a district court is not required in all

(Id. at ¶ 2).  He had been a farmer, but had retired in 2006.  (Id. at ¶ 3).  Still,

Eisenberry kept several animals on his property, including horses and pigs.  (Id.).

Shaw and Eisenberry met 10 to 12 years previously.  (Id. at ¶ 5).  Shaw asked

Eisenberry to "help him at the barn when" needed, and Eisenberry agreed to do so.

(Id. at ¶ 6).  Shaw called for help 10 to 12 times a year.  (Id. at ¶ 7).  Eisenberry

cleaned the barn, fed animals, and stacked hay in the bar.  (Id. at ¶ 8).  Shaw let

Eisenberry take hay for his animals, between 5 and 15 bales per month.  (Id. at ¶ 9).

Shaw did not tell Eisenberry how many bales he could take; Eisenberry simply took

what he needed.  (Id. at ¶ 10).  Sometimes Shaw let Eisenberry borrow his truck.

(Id. at ¶ 11).  He sometimes gave Eisenberry five or ten dollars for gas.  (Id.).  Shaw

also allowed Eisenberry open access to the barn, where Eisenberry would

sometimes go simply to visit the animals.  (Id. at ¶ 12).   In the end, Eisenberry

insists, he never considered himself Shaw's employee, nor did he see himself as an

---

cases to disregard the affidavit." Baer, 329 F.3d at 624.  "When there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." Id. at 625.  The court will not disregard the affidavit as a sham, since the affidavit is not necessarily contradictory.  The affidavit does not contradict Eisenberry's deposition testimony or his sworn testimony in other proceedings in reference to the kinds of work he did for Shaw, nor the hay and cash he received in exchange for that work.  Likewise, Eisenberry's description of his frequent presence at the barn and frequent assistance to Shaw does not contradict Eisenberry's sworn testimony.  The area of concern here is Eisenberry's claim in his affidavit that he was never Shaw's "employee."  In a deposition taken in another case, Eisenberry asserts that he "worked" for Shaw.  Even this testimony, however, is not necessarily contradictory, especially since Eisenberry denied he was Shaw's employee.  At issue in this case is the meaning of "employee" in the insurance policy.  The term is undefined and ambiguous as there used.  Eisenberry admitted in his testimony that Shaw did not put him on his payroll and all of Eisenberry's testimony is clear that he was never paid by check.  The differences between the affidavit and Eisenberry's earlier sworn statements reflect the ambiguity and difficulty of the term "employee."

employee of the Donkey Ball company.  (Id. at ¶ 14).  Shaw never paid Eisenberry

an hourly, weekly or monthly wage.  (Id.).  Shaw gave him no training.  (Id. at ¶ 15).

On the day of the incident, Eisenberry assisted in moving and stacking hay in

the barn.  (Shaw Dep. at 43).  While Shaw testified that he could normally perform

the task of stacking hay by himself, on the day of the accident Eisenberry helped him

unload a wagon of hay onto the second floor of the barn.  (Id. at 43-44).  Shaw was

unsure of why Eisenberry had come to the farm that day.  (Id. at 17).  He first saw

him at 6:30 or 7 p.m.  (Id. at 16).  Shaw had not called Eisenberry to come to the

barn that day; he speculated Eisenberry may simply have driven by after feeding his

animals.  (Id.).  Eventually, Shaw and Eisenberry worked together to unload sixty or

seventy bales of hay on the first floor of the barn.  (Id. at 19).  Shaw and another

man who had helped bale the hay, Snell, then intended to put another load of hay "in

the top of the barn."  (Id. at 22).  Shaw told Eisenberry they did not need his help for

this operation.  (Id. at 22-23).  Using an "elevator," the two men loaded up a third of

the bales on the wagon to the top of the barn.  (Id. at 25).  Shaw then heard Snell

yell from the top of the barn to stop the elevator.  (Id.).  Shaw unplugged the

machine.  (Id.).  Investigating, Shaw discovered Eisenberry laying on the floor.  (Id.

at 26-27).  Shaw insisted to the investigator that Eisenberry was not assisting him in

any way before he fell.  (Id. at 28).  He had planned to give Eisenberry "one round

bale" of hay instead of money, but had not done so before he fell.  (Id. at 29).

The question here is whether the policy exclusion that prevents coverage for

employees applies to this case.  Courts have held that "in Pennsylvania as

15

elsewhere, exclusions are strictly construed against the insurer, as are ambiguities in the policy.  Clear policy language, however, is to be given effect, and courts should not 'torture the language to create' ambiguities but should read policy provisions to avoid it."  Selko v. Home Ins. Co., 139 F.3d 146, 152, n.3 (3d Cir. 1998).  The policy clearly does not cover employees, but the term is not defined in the contract.  The definitions portion of the policy declares that "'employee' includes a 'leased worker.'" (Policy of Insurance).  A "'leased worker' means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm."  (Id.).  No evidence indicates that a labor leasing firm supplied Eisenberry to assist Shaw's operations.  Thus, the policy cannot exclude Eisenberry on the grounds that he was a leased worker.

The term "employee" in the policy, however, "does not include a 'temporary worker.'"  (Id.), and defendant argues that Eisenberry could be termed a temporary worker.  A "'temporary worker'" is "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions."  (Id.).  Eisenberry clearly did not replace another, permanent employee. He could only be a "temporary worker," then, if his employment served to "meet seasonal or short-term workload conditions" and his employment was "furnished to" Shaw.  (Id.).  No evidence indicates that Eisenberry was "furnished" to Shaw as an employee.  The court therefore concludes that Eisenberry was not a temporary worker and defendant cannot avoid the employment exclusion on those grounds.

Eisenberry also could not be considered a "volunteer worker" under the

16

policy's terms.  A volunteer worker, as explained above, is one who "donates his or her work and acts at the direction" of the insurer "and within the scope of duties determined by" the insured but who "is not paid a fee, salary or other compensation" by the insured "or anyone else for their work performed for" the insured.  (Id.).  All parties agree that Eisenberry received hay and cash in exchange for feeding donkeys and cleaning the barn.  He therefore received a salary or other compensation for his services, and cannot be a volunteer worker.

The question for the court, therefore, is whether Eisenberry was Shaw's employee at the time of his injury.  The policy does not provide a positive definition of the term "employee," and the court must find meaning for this term.   Plaintiff argues that the court should apply Pennsylvania law to determine whether Eisenberry was an employee, and cites to state workers' compensation laws and common-law master-servant principles.  Defendants point to IRS regulations and workers' compensation law in Pennsylvania to argue that Eisenberry was not a Shaw Brothers employee.

In Pennsylvania, "'a determination regarding the existence of an employer/employee relationship is a question of law that is determined on the unique facts of each case.'" State Auto. Mut. Ins. Co. v. Christie, 802 A.2d 625, 628 (Pa. Super. Ct. 2002) (quoting Universal Am-Can, Ltd. v. Workers Comp. Appeal Bd., 762 A.2d, 328, 330-31 (Pa. 2000)).  Both parties look to Pennsylvania workers' compensation law to help determine whether Eisenberry was Shaw's employee. Under the Pennsylvania Workers' Compensation Act, "the term 'employe, [sic]' as

used in this act is declared to be synonymous with servant." 77 Penn. Stat. § 22.

Moreover, the Act provides that "an 'employee' [includes] '[a]ll natural persons who

perform services for another for a valuable consideration, exclusive of persons

whose employment is casual in character and not in the regular course of the

business of the employer.'" Brookhaven Baptist Church v. Workers' Comp. Appeal

Bd., 912 A.2d 770, 776 (Pa. 2006) (quoting 77 Pa. Stat. § 22).  In terms of

consideration, "if services are performed for the payor directly, the presumption is

that the amount received is for the service and it is not a gift or honorarium." Id. at

777.  "'[E]mployment is casual in character where it is occasional, irregular, or

incidental as distinguished from regular and continuous.'" Id. (quoting Williams v.

Baptist Church, 186 A. 168, 170 (Pa. Super. Ct. 1936)).

    The Pennsylvania Supreme Court has noted that there is an ambiguity in

Pennsylvania courts' interpretation of this portion of the Act's definition of

"employee."  While some courts have concluded that "to be exempt from coverage, a

person must be both casually employed and not engaged in the business of the

employer," other Pennsylvania decisions "exempt persons who are casually

employed as well as those who are not engaged in the business of the employer,

meaning that either situation would exclude the employee from coverage."

Brookhaven Baptist Church, 912 A.2d at 778.  The court is persuaded by the

reasoning of those decision that conclude a worker is exempt from coverage–and in

that sense not an employee–if that worker is either employed casually or not

engaged in the business of the employer.

18

The court finds that the Eisenberry was casually employed by the defendants and thus not an employee under Pennsylvania law.  Courts have found that "it is obvious that the term 'casual' is not capable of scientific definition."  Cochrane v. William Penn Hotel, 16 A.2d 43, 44 (Pa. 1940).  Casual employment occurs when "a person is employed only occasionally, at comparatively long and irregular intervals, for limited and temporary purposes."  Id.  Employment is not casual, however, "if the need for the work recurs with a fair degree of frequency and regularity, and it being thus anticipated, there is an understanding that the employee is to perform such work as the necessity for it may from time to time arise."  Id. at 45.  Here, the evidence described above indicates that Eisenberry provided labor for Shaw, but his work came only occasionally and for the limited and temporary purpose of feeding and watering donkeys or moving bales of hay.  No evidence indicates that Eisenberry had a set schedule he was required to meet–even if he did choose to spend a good deal of time on Shaw's farm, whether helping out or not--or that there was an understanding between the parties that Eisenberry was required to assist Shaw whenever the business had need of a laborer.  Neither did Eisenberry receive a set salary in exchange for his assistance.  Such work is casual under Pennsylvania law.

Moreover, Pennsylvania case law indicates that a relationship like the one between Shaw and Eisenberry should not be considered an employer-employee relationship.  This case is like Stewart v. Uryc, 352 A.2d 465 (Pa. Super. Ct. 1975).  In that case, the court determined that a minor plaintiff was not an employee of a

sanitation company, thus allowing the plaintiff to sue in tort rather than make use of

Workers' Compensation procedures.  Stewart, 352 A.2d at 471.  In Stewart, the

defendant operated a private sanitation business.  Id. at 467.  During one summer,

the plaintiff "began to accompany appellee two or three times a week on various

jobs."  Id.  He was injured on one of these jobs when he stepped off the sanitation

truck and was pulled under the truck's wheels.  Id.  Testimony indicated that the

parties had "a very informal relationship."  Id. at 469.  The plaintiff did not receive a

fixed salary; defendant would give him "a couple bucks," at times when defendant

had the money.  Id.  Often, plaintiff worked without pay.  Id.  Plaintiff would arrange

to work with defendant "if [he] didn't have anything else to do."  Id. at 470.  Though

plaintiff was motivated in part to help by the money he received, the parties never

had a "specific understanding about paying any specific amount."  Id.  Indeed, the

court concluded, the "plaintiff's primary motive for assisting the defendant was

enjoyment."  Id.  In the end, the court found that "the totality of the circumstances

does not lead to the conclusion that a contract of employment existed between minor

plaintiff and appellee by tacit understanding."  Id. at 271.  The circumstances that led

to this conclusion included the fact that "plaintiff was free to refuse to do any work,"

his pay was irregular, and "depended entirely on the available resources of"

defendant, the plaintiff assisted because he enjoyed riding on the truck, "not

because he sought compensation for regular employment," and because the

defendant did not place plaintiff on his payroll or pay any taxes on his employment.

Id.

20

Similarly, as explained above, the facts in this case indicate that Eisenberry did not receive regular pay for his employment, but instead occasional gas money and hay to feed his animals as Shaw could provide it.  Eisenberry did not work on a fixed schedule, and future opportunities to cut hay or feed animals did not depend on Eisenberry's willingness to appear when requested.  In addition, Eisenberry's motivation for feeding the donkeys does not appear to have been motivated simply by a desire for regular employment.  Instead, Eisenberry–retired but experienced in farm labor–appeared to use work at the farm as an opportunity to socialize with his neighbors and be around a type of life with which he was accustomed.  Any pay that he received was supplemental and incidental to his larger purpose for spending his time on Shaw's farm.  Finally, the evidence indicates that Eisenberry was never on Shaw's payroll, nor did Shaw pay any payroll taxes based on his employment.  See also, Busch v. Bientzle, 181 A. 520, 521-22 (Pa. Super. Ct. 1935) (plaintiff not an employee because defendant was not "obligated to pay any wages"; employer exerted "[n]o definite control . . . over the plaintiff's movements"; plaintiff could refuse any work assignment; wage received was minimal and no express or implied contract existed for wages existed).

The court therefore concludes that Eisenberry was not an employee at the time of his injury.  The employer's liability exclusion does not apply to this case.  The court finds that the policy provides defendants coverage for the incident in question.  The court will therefore deny the plaintiff's motion for summary judgment on this matter and grant the defendants'.

21

**Conclusion**

  For the reasons stated above, the court will deny the plaintiff's motion for summary judgment and grant the defendants'.  The court determines that the insurance policy provides coverage for defendants in this matter.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONWIDE MUTUAL** | : | **No. 3:10cv374** |
| **INSURANCE COMPANY,** | : | |
| **Plaintiff** | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TIMOTHY SHAW;** | : | |
| **TIMOTHY SHAW, d/b/a SHAW** | : | |
| **BROTHERS DONKEY** | : | |
| **BALL CO.; and** | : | |
| **ROBERT EISENBERRY,** | : | |
| **Defendants** | : | |
| | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

**AND NOW**, to wit, this 22nd day of August 2011, the defendants' motion for

summary judgment (Doc. 25) is hereby **GRANTED**.  The plaintiff's motion for summary

judgment (Doc. 27) is hereby **DENIED**.  The plaintiff's request for a declaratory

judgment that the insurance policy in question does not provide coverage to the

defendants for the incident in question is hereby **DENIED**, as the court has determined

that the policy does provide coverage.


**BY THE COURT:**


 s/ James M. Munley
**JUDGE JAMES M. MUNLEY**

**United States District Court**